**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No.:**

ADANA INVESTING, INC.,

     Plaintiff,

v.

WELLS FARGO BANK, N.A.,
WELLS FARGO ADVISORS, LLC,
BENJAMIN RAFAEL,
HERNAN BERMUDEZ,
and PAUL ZOCH,

     Defendants.

_____ /

## COMPLAINT

Plaintiff ADANA INVESTING, INC. ("ADANA"), by and through counsel, brings this Complaint against Defendants WELLS FARGO BANK, N.A. ("WELLS FARGO BANK"), WELLS FARGO ADVISORS, LLC ("WELLS FARGO ADVISORS") (collectively, the "WELLS FARGO DEFENDANTS"), BENJAMIN RAFAEL ("RAFAEL"), HERNAN BERMUDEZ ("BERMUDEZ"), and PAUL ZOCH ("ZOCH"), and alleges:

### NATURE OF THE ACTION

1.     Plaintiff ADANA brings this action against the WELLS FARGO DEFENDANTS and their employees, RAFAEL, BERMUDEZ, and ZOCH, for fraudulent misrepresentation and aiding and abetting the conversion of more than $28.5 million that ADANA deposited into an account at WELLS FARGO BANK. ADANA deposited the funds in accordance with the terms of what ADANA believed were three short-term loans. In reality, almost immediately after they were deposited, ADANA's funds were wrongly converted and dissipated.

1

2.      The WELLS FARGO DEFENDANTS and their employees, RAFAEL, BERMUDEZ, and ZOCH, played an active and indispensable role in the conversion. Prior to ADANA agreeing to make the loans, the WELLS FARGO DEFENDANTS' officers and bankers hosted meetings with ADANA's representatives in boardrooms at WELLS FARGO BANK and WELLS FARGO ADVISORS locations in South Florida to convince ADANA of the legitimacy of the deals. Additionally, WELLS FARGO BANK provided written assurances that ADANA's loan proceeds would be held in a restricted account. Then, after ADANA deposited the loan proceeds, a banker at WELLS FARGO BANK actively concealed the conversion.

## PARTIES, JURISDICTION, AND VENUE

3.      Plaintiff ADANA is a British Virgin Islands corporation, with its principal place of business in Tortola, British Virgin Islands.

4.      Defendant WELLS FARGO BANK is a national bank, with its principal place of business in California. WELLS FARGO BANK has over 600 bank locations in Florida, and displays its name over the Miami skyline on the one of the tallest buildings in the state. Upon information and belief, WELLS FARGO BANK is a wholly-owned subsidiary affiliate of Wells Fargo & Company.

5.      The Court has general personal jurisdiction over WELLS FARGO BANK because it is engaged in substantial and not isolated activity within Florida; operates, conducts, engages in, and carries on a business in Florida; and has offices in Florida.

6.      Defendant WELLS FARGO ADVISORS is a Delaware limited liability company, with its principal place of business in Missouri. WELLS FARGO ADVISORS is a wholly-owned subsidiary of Wachovia Securities Financial Holdings, LLC, which is its sole member. Wachovia Securities Financial Holdings, LLC is a Delaware limited liability company. Wachovia Securities Financial Holdings, LLC is a wholly-owned subsidiary of Wells Fargo &

2

Company. Wells Fargo & Company is a Delaware corporation, with its principal place of business in California. WELLS FARGO ADVISORS has at least 10 offices in South Florida.

7.      The Court has general personal jurisdiction over WELLS FARGO ADVISORS because it is engaged in substantial and not isolated activity within Florida; operates, conducts, engages in, and carries on a business in Florida; and has offices in Florida.

8.      WELLS FARGO BANK and WELLS FARGO ADVISORS are affiliates of each other.

9.      Wells Fargo & Company offers private banking and wealth management services to high net worth clients through its Wells Fargo Private Bank segment.

10.     Both WELLS FARGO BANK and WELLS FARGO ADVISORS provide services to clients of the Wells Fargo Private Bank segment.

11.     WELLS FARGO BANK offers and provides deposit services and deposit accounts for clients of Wells Fargo Private Bank.

12.     WELLS FARGO ADVISORS offers and provides brokerage products and financial advising for clients of Wells Fargo Private Bank.

13.     RAFAEL is an individual and, upon information and belief, is a citizen of Florida who resides in Miami, Florida.

14.     The Court has personal jurisdiction over RAFAEL because he is a citizen of Florida and committed a tort within Florida.

15.     At all relevant times until June 18, 2015, RAFAEL was employed by WELLS FARGO BANK as a personal banker in Miami, Florida.

16.     As a personal banker at WELLS FARGO BANK, RAFAEL's duties and responsibilities included, without limitation, providing advice to customers; servicing customer relationships; speaking and meeting with customers at the bank location; selling retail banking

products and services to customers and prospective customers; referring customers to other segments of WELLS FARGO BANK and its affiliates; cross-selling all products and services; developing and maintaining relationships with WELLS FARGO BANK's partners and affiliates; reviewing and processing credit and loan applications; opening, maintaining, and managing deposit accounts for clients; and managing customer portfolios.

17.     ZOCH is an individual and, upon information and belief, is a citizen of Florida who resides in Palm Beach County, Florida and works in Broward County, Florida.

18.     The Court has personal jurisdiction over ZOCH because he is a citizen of Florida and committed a tort within Florida.

19.     At all relevant times through the present, ZOCH has been employed by WELLS FARGO BANK and/or WELLS FARGO ADVISORS as a Financial Advisor and an Assistant Vice President in Plantation, Florida.

20.     Additionally, ZOCH has been a licensed broker registered with the Financial Industry Regulatory Authority ("FINRA") through WELLS FARGO ADVISORS since July 2011 through present.

21.     As a Financial Advisor and an Assistant Vice President for WELLS FARGO BANK and/or WELLS FARGO ADVISORS, upon information and belief, ZOCH's duties and responsibilities have included, without limitation, providing advice to customers; servicing customer relationships; speaking and meeting with customers at the bank location; referring customers to other segments of WELLS FARGO BANK, WELLS FARGO ADVISORS, and their affiliates; cross-selling products and services; and opening accounts for clients.

22.     BERMUDEZ is an individual and, upon information and belief, is a citizen of Florida who resides in Broward County, Florida.

23.     The Court has personal jurisdiction over BERMUDEZ because he is a citizen of Florida and committed a tort within Florida.

24.     At all relevant times until November 6, 2015, BERMUDEZ was employed by and/or acted as an agent of WELLS FARGO BANK and/or WELLS FARGO ADVISORS as a Regional Bank Private Banker and an Assistant Vice President at Wells Fargo Regional Bank in Fort Lauderdale, Florida.

25.     As a Regional Bank Private Banker and an Assistant Vice President for WELLS FARGO BANK and/or WELLS FARGO ADVISORS, upon information and belief, BERMUDEZ's duties and responsibilities included, without limitation, providing advice to customers; servicing customer relationships and acting as the customer relationship manager; speaking and meeting with customers at the bank location; referring customers to other segments of WELLS FARGO BANK and its affiliates; cross-selling products and services; developing and maintaining relationships with WELLS FARGO BANK's partners and affiliates; and opening accounts for clients.

26.     Additionally, since February 2011, BERMUDEZ had been a licensed broker registered with FINRA through WELLS FARGO ADVISORS in Fort Lauderdale, Florida.

27.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States and a citizen of a foreign state.

28.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) because a substantial part of the events and omissions giving rise to ADANA's claims occurred in this District and, upon information and belief, a substantial part of the property that is subject of this action may be or may have been at certain times relevant to this action in this District.

## FACTS

### The WELLS FARGO DEFENDANTS, and their employees, RAFAEL and ZOCH, Play an Indispensable Role in Setting up the Scheme to Convert ADANA's Property

29.    Benjamin McConley ("McConley"), Jason Van Eman ("Van Eman"), and Ross Marroso ("Marroso"), and their companies, Forrest Capital Partners, Inc. ("FCP"), Forrest Capital and Co., LLC ("FCC"), Weathervane Productions, Inc. ("Weathervane"), and WVP Holding, LLC ("WVP") (collectively, the "Forrest Capital Parties") purport to be in the film production financing and investment business.

30.    In January 2015, the Forrest Capital Parties approached ADANA about making a short-term loan to WVP. The Forrest Capital Parties represented to ADANA that Weathervane had an opportunity to produce three films. To do so, the Forrest Capital Parties represented to ADANA that Weathervane wanted to obtain a line of credit to be used as permanent financing to produce the films. The Forrest Capital Parties further represented that in order to obtain the line of credit, Weathervane needed to put up collateral.

31.    The Forrest Capital Parties represented to ADANA that FCP had already committed to provide half of the collateral needed, but that before FCP could do so, FCP's charter required Weathervane, as the borrower, to secure "matched funding" equal to the amount to be contributed by FCP.

32.    The Forrest Capital Parties proposed that ADANA make a short-term loan to WVP, a special purpose vehicle created by Weathervane. WVP would then use the loan proceeds as the "matched funding" portion of the collateral to obtain the line of credit to be used as permanent financing for the production of the films.

33.    While ADANA was interested in the proposed short-term loan to WVP, ADANA was not willing to lend funds to WVP without first receiving confirmation from FCP's bank of FCP's ability to provide its portion of the collateral needed by WVP, as well as assurances as to

6

Forrest Capital Parties' relationship and standing with the bank that was to issue the line of credit.

34.     The Forrest Capital Parties advised ADANA that their banking relationship was with Wells Fargo Private Bank. The Forrest Capital Parties explained that FCP maintained its assets with Wells Fargo Private Bank through WELLS FARGO ADVISORS, and that WELLS FARGO BANK was to issue the line of credit.

35.     Before ADANA agreed to lend the funds to WVP, Alastair Burlingham ("Burlingham") and Lee Vandermolen ("Vandermolen") conducted due diligence into the Forrest Capital Parties' relationship and standing with WELLS FARGO ADVISORS and WELLS FARGO BANK.

36.     Burlingham and Vandermolen relayed to ADANA the details of due diligence that they had conducted recently into the Forrest Capital Parties' relationship and standing with WELLS FARGO ADVISORS and WELLS FARGO BANK. ADANA, in turn, relied on this information.

37.     Specifically, on October 30, 2014, McConley, Van Eman, and an attorney for the Forrest Capital Parties, Richard Rossi ("Rossi"), introduced Burlingham and Vandermolen to ZOCH, who represented himself to be FCP's banker and financial advisor at WELLS FARGO ADVISORS.

38.     The October 30, 2014 meeting took place in a conference room at a branch of WELLS FARGO ADVISORS in Fort Lauderdale, Florida.

39.     During the meeting, ZOCH represented to Burlingham and Vandermolen that: (1) FCP and McConley were clients of WELLS FARGO ADVISORS; (2) WELLS FARGO ADVISORS administered and managed the trust assets of FCP's family office; and (3) FCP's family office had assets of hundreds of millions of dollars.

40.     Upon information and belief, ZOCH's representation about FCP having assets of hundreds of millions of dollars with WELLS FARGO ADVISORS was false. Upon information and belief and unbeknownst to ADANA at the time, as of December 3, 2014, FCP's brokerage accounts with WELLS FARGO ADVISORS contained only $277,366.

41.     Additionally, at the October 30, 2014 meeting, ZOCH represented to Burlingham and Vandermolen that: (1) the WELLS FARGO DEFENDANTS had been involved in similar film financing deals between the Forrest Capital Parties and other lenders that were successfully completed; and (2) FCP had $100 million in assets with WELLS FARGO ADVISORS that was dedicated to investing in Weathervane's film financing projects.

42.     Upon information and belief, ZOCH's representations about the successful completion of similar film financing deals between the Forrest Capital Parties and other lenders were false. Within weeks of the October 30, 2014 meeting, and unbeknownst to ADANA at the time, two other victims of the Forrest Capital Parties' scheme filed suit alleging conversion of their loan proceeds deposited with WELLS FARGO ADVISORS and/or WELLS FARGO BANK.

43.     Subsequently, after the contemplated transaction had advanced, on March 13, 2015, McConley and Van Eman met with Burlingham and Vandermolen at a branch of WELLS FARGO BANK located at 1395 Brickell Avenue, Miami, Florida. At the WELLS FARGO BANK branch, McConley and Van Eman introduced Burlingham and Vandermolen to an employee of WELLS FARGO BANK, RAFAEL, who identified himself as the Forrest Capital Parties' banker. Another unidentified individual, who introduced herself as RAFAEL's manager at WELLS FARGO BANK, was also present at the March 13, 2015 meeting.

44.     At all relevant times until June 18, 2015, RAFAEL was employed by WELLS FARGO BANK as a personal banker in Miami, Florida.

8

45.     Upon information and belief, at all relevant times, the unidentified individual, who introduced herself as RAFAEL's manager at WELLS FARGO BANK, was employed by WELLS FARGO BANK.

46.     During the March 13, 2015 meeting, RAFAEL represented to Burlingham and Vandermolen that McConley and FCP were clients in good standing of WELLS FARGO BANK and WELLS FARGO ADVISORS. RAFAEL also discussed with Burlingham and Vandermolen the proposed loan from ADANA to WVP Holding. In discussing the proposed loan, RAFAEL represented to Burlingham and Vandermolen that: (1) WELLS FARGO BANK would be able to issue a line of credit within 90 days of the loan; and (2) ADANA's loan proceeds would be held in a restricted account.

47.     Burlingham and Vandermolen relayed the representations made by RAFAEL, on behalf of WELLS FARGO BANK, at the March 13, 2015 meeting to ADANA, and ADANA, in turn, relied on the information.

48.     Three days later, on the morning of March 16, 2015, Burlingham and Vandermolen again met with McConley, Van Eman, and RAFAEL.

49.     Marroso, Rossi, Adam Falkoff (the founder of a Washington, D.C.-based lobbying and public relations firm, known upon information and belief to ADANA as Capital Keys), and another unidentified officer of WELLS FARGO BANK also attended the March 16, 2015 meeting.

50.     The March 16, 2015 meeting took place in a boardroom behind security doors at the same branch of WELLS FARGO BANK located at 1395 Brickell Avenue, Miami, Florida.

51.     At the March 16, 2015 meeting, RAFAEL and the unidentified officer represented to Burlingham and Vandermolen that: (1) FCP had substantial assets at WELLS FARGO BANK and WELLS FARGO ADVISORS; (2) WELLS FARGO BANK would be willing to provide up

to $100 million of collateralized loan exposure for FCP; and (3) should ADANA agree to lend the funds to WVP, WELLS FARGO BANK would hold ADANA's loan proceeds in restricted accounts.

52. Upon information and belief, the representations set forth above that RAFAEL made at the March 16, 2015 meeting were false.

53. Burlingham and Vandermolen relayed the representations made by RAFAEL, on behalf of WELLS FARGO BANK, at the March 16, 2015 meeting to ADANA, and ADANA, in turn, relied on the information.

54. The October 30, 2014, March 13, 2015, and March 16, 2015 meetings between Burlingham and Vandermolen and the WELLS FARGO DEFENDANTS were critical in convincing ADANA to agree to make the short-term loans to WVP.

55. ADANA relied heavily upon the WELLS FARGO DEFENDANTS' representations that FCP had assets sufficient to provide its portion of the collateral.

56. Additionally, ADANA relied heavily upon the WELLS FARGO DEFENDANTS' representations about their prior and continuing involvement with the Forrest Capital Parties' film financing deals. That involvement purportedly included, to wit, WELLS FARGO BANK extending millions of dollars in lines of credit to FCP, and WELLS FARGO ADVISORS working with WELLS FARGO BANK to collateralize those lines of credit with FCP's brokerage accounts with WELLS FARGO ADVISORS. These representations, in particular, were critical in convincing ADANA that the Forrest Capital Parties were legitimate film producers that had successfully completed similar deals before, and that the Forrest Capital Parties had sufficient assets to complete the proposed deals with ADANA.

57. Further, ADANA considered the WELLS FARGO DEFENDANTS' participation in the forthcoming deals to be a substantial basis for its confidence in the legitimacy of the

10

transactions and the security of the loan proceeds because (1) ADANA understood the WELLS FARGO DEFENDANTS to have undertaken measures standard in the industry to ensure that its banking clients were who and what they purported to be; and (2) because ADANA understood the bankers with whom they spoke at the branches of WELLS FARGO ADVISORS in Ft. Lauderdale, Florida and WELLS FARGO BANK in Miami, Florida to be acting on behalf of the WELLS FARGO DEFENDANTS.

58.    By early May 2015, ADANA and WVP had agreed in principal to the terms of the first short-term loan from ADANA to WVP.

59.    Prior to executing the loan agreement, however, ADANA required written assurance from WELLS FARGO BANK that the loan proceeds would be secure. This was consistent with ADANA's reliance upon WELLS FARGO BANK's representation, through RAFAEL, at the March 16, 2015 meeting that WELLS FARGO BANK would hold ADANA's loan proceeds in a restricted account.

60.    On May 13, 2015, Van Eman provided ADANA with a letter, dated May 12, 2015, from WELLS FARGO BANK (the "May 12, 2015 Wells Fargo Letter"). In the letter, WELLS FARGO BANK confirmed that it would open an account to hold ADANA's loan proceeds, and that ADANA's loan proceeds would not be removed from the account without ADANA's express consent. The letter was on WELLS FARGO BANK letterhead and signed by RAFAEL as a "Duly authorised signatory for and on behalf of WELLS FARGO BANK, N.A."

61.    In reliance on the representations made by WELLS FARGO ADVISORS and WELLS FARGO BANK at the in-person meetings on October 30, 2014, March 13, 2015, and March 16, 2015 and in the May 12, 2015 Wells Fargo Letter, ADANA agreed to loan the $15 million to WVP on May 15, 2015.

62. On May 15, 2015, ADANA and WVP entered into a Bridging Facility Agreement, dated as of May 15, 2015 (the "May 15, 2015 Loan Agreement").

63. That same day, on May 15, 2015, WVP drew down the loan proceeds, and instructed ADANA to deposit the $15 million in loan proceeds into an account in the name of FCC (account no. xxxxxx5075) at WELLS FARGO BANK (the "FCC Wells Fargo Account").

64. Pursuant to the May 15, 2015 Loan Agreement, WVP was to repay ADANA, with interest, within 125 days of WVP's drawdown of the loan proceeds (*i.e.*, by September 20, 2015).

65. After ADANA deposited the $15 million into the FCC Wells Fargo Account, ADANA requested confirmation from the Forrest Capital Parties and WELLS FARGO BANK that the funds had been received and that the account restrictions were in place.

66. On May 28, 2015, FCP provided a letter to ADANA, in which FCP represented that FCP had "matched the contribution and allocated applicable resources to complete the financing of our project's budget," and "The appropriate compliance officer and the undersigned bank officer/notary have verified funds and all related documents, contracts and internal requirement have been filed and processed."

67. RAFAEL notarized FCP's May 28, 2015 letter.

68. Despite FCP's representation, ADANA requested confirmation directly from WELLS FARGO BANK that it had received ADANA's loan proceeds and FCP's matched contribution.

69. On June 2, 2015, Burlingham, on behalf of ADANA, emailed McConley and RAFAEL at his WELLS FARGO BANK email address (benjamin.rafael@wellsfargo.com): "can I please ask Benjamin Rafael to provide email confirmation replying all to this email of the

hard posting and FCP matching of the $15m Adana slate finance contribution pending issuance of the formal bank letter/signature cards etc for Adana."

70.     In response, on June 2, 2015, RAFAEL, from his WELLS FARGO BANK email address (benjamin.rafael@wellsfargo.com), emailed the following representation to ADANA: "The contribution has been received and matched by Forrest Capital and everything is set. We are processing all the requirements and moving forward. The signature cards are on their way."

71.     Upon information and belief, WELLS FARGO BANK was monitoring or should have been monitoring RAFAEL's emails. According to the Wells Fargo Team Member Handbook (January 2016), "Wells Fargo will monitor and may control access to and use of its equipment and electronic communication systems, including but not limited to original and backup copies of email," and "Wells Fargo monitors and filters all email messages based on specific content, including unencrypted sensitive information (for example, Social Security numbers, financial account numbers)."

72.     Though unknown to ADANA at the time, the representations in FCP's May 28, 2015 letter, notarized by RAFAEL on behalf of WELLS FARGO BANK, and RAFAEL's June 2, 2015 email from his WELLS FARGO BANK email address, were completely false.

73.     In reality, FCP never made its matched contribution of $15 million. There never was a line of credit in favor of FCP of any kind.

### *The Forrest Capital Parties Convert ADANA's $15 Million from the First Loan*

74.     To the contrary, by June 2, 2015, the Forrest Capital Parties had already converted $13.7 million of ADANA's $15 million.

75.     On May 19, 2015, FCC, the holder of the account into which ADANA deposited the $15 million in loan proceeds, made two transfers of $750,000 and one transfer of $500,000

out of the FCC Wells Fargo Account and into an existing account (account no. xxxxxx5059) in the name of FCP at WELLS FARGO BANK (the "FCP Wells Fargo Account").

76.     Then over the two-week period from May 21, 2015 through June 4, 2015, FCC made a series of 16 transfers of $900,000 each out of the FCC Wells Fargo Account and into the FCP Wells Fargo Account.

77.     Upon receipt of ADANA's funds, FCP made a series of large, whole number transfers to accounts in the names of McConley (also at WELLS FARGO BANK), Van Eman, and others.

78.     According to the account records for the FCP Wells Fargo Account, WELLS FARGO BANK received a benefit from these numerous transfers in the form of transaction fees.

### WELLS FARGO BANK and Its Employee, RAFAEL, Conceal the Conversion of ADANA's $15 Million

79.     The representations in FCP's May 28, 2015 letter, notarized by RAFAEL on behalf of WELLS FARGO BANK, and RAFAEL's June 2, 2015 email from his WELLS FARGO BANK email address concealed the Forrest Capital Parties' conversion of ADANA's $15 million.

80.     Had ADANA discovered that FCC and FCP had transferred away the $15 million in loan proceeds to accounts in the names of McConley and Van Eman and others, ADANA would never have made additional loans to WVP or deposited additional funds into the FCC Wells Fargo Account.

### Because of the Cover Supplied by WELLS FARGO BANK, ADANA Is Lured into Additional Transactions

81.     On June 22, 2015, ADANA agreed to make what it understood to be a second short-term bridge loan to WVP for $2.3 million.

14

82.     The June 22, 2015 loan was made under the auspices of the same banking framework that had been described to ADANA by agents of the WELLS FARGO DEFENDANTS.

83.     In agreeing to make the June 22, 2015 loan to WVP, ADANA relied on the representations made by WELLS FARGO ADVISORS and WELLS FARGO BANK at the in-person meetings on October 30, 2014, March 13, 2015, and March 16, 2015.

84.     ADANA also relied on what it believed to be was the successful start to the May 15, 2015 loan transaction.

85.     ADANA further relied on a letter, dated June 18, 2015, from WELLS FARGO BANK (the "June 18, 2015 Wells Fargo Letter"), which was provided to ADANA by Van Eman. In the letter, WELLS FARGO BANK confirmed that it would open an account to hold ADANA's loan proceeds, and that ADANA's loan proceeds would not be removed from the account without ADANA's express consent. The letter was on WELLS FARGO BANK letterhead, and signed by RAFAEL as "Duly authorised signatory for and on behalf of WELLS FARGO BANK, N.A."

86.     On June 22, 2015, ADANA and WVP entered into a Bridging Facility Agreement, dated as of June 22, 2015 (the "June 22, 2015 Loan Agreement").

87.     As with the May 15, 2015 loan, WVP instructed ADANA to deposit the loan proceeds from the June 22, 2015 loan into the FCC Wells Fargo Account.

88.     Accordingly, on June 22, 2015, ADANA, at the instruction of WVP, deposited $2,242,500 into FCC's Wells Fargo Account.

89.     Pursuant to the June 22, 2015 Loan Agreement, WVP was to repay ADANA, with interest, within 125 days of WVP's drawdown of the loan proceeds (*i.e.*, by October 25, 2015).

90.     On July 13, 2015, ADANA agreed to make what it understood to be a third short-term bridge loan to WVP for $11.3 million, under the auspices of the same banking framework that had been described to them by agents of the WELLS FARGO DEFENDANTS.

91.     Again, in agreeing to make the July 13, 2015 loan to WVP, ADANA relied on the representations made by WELLS FARGO ADVISORS and WELLS FARGO BANK at the in-person meetings on October 30, 2014, March 13, 2015, and March 16, 2015.

92.     ADANA also relied on what it believed to be was the successful start to the May 15, 2015 loan transaction.

93.     On July 13, 2015, ADANA and WVP entered into a Bridging Facility Agreement, dated as of July 13, 2015 (the "July 13, 2015 Loan Agreement").

94.     As with the May 15, 2015 and June 22, 2015 loans, WVP instructed ADANA to deposit the loan proceeds from the July 13 2015 loan into the FCC Wells Fargo Account.

95.     Accordingly, on July 13, 2015, ADANA, at the instruction of WVP, deposited $11.3 million into FCC's Wells Fargo Account.

96.     Pursuant to the July 13, 2015 Loan Agreement, WVP was to repay ADANA, with interest, within 125 days of WVP's drawdown of the loan proceeds (*i.e.*, by November 15, 2015).

### The Forrest Capital Parties Convert ADANA's Loan Proceeds from the Second and Third Loans

97.     As with the proceeds from the May 15, 2015 loan, and unbeknownst to ADANA at the time, the Forrest Capital Parties converted the proceeds from the June 22, 2015 and July 13, 2015 loans almost as soon as the proceeds were deposited into the FCC Wells Fargo Bank Account.

98.     Again, the conversion was accomplished through the systematic transfer of large, whole number amounts to the FCP Wells Fargo Account, and then to Van Eman and others. For

example, over a three-day period from July 14–16, 2015, FCC made 12 transfers of $900,000 each to FCP.

99.     Again, according to the account records for the FCP Wells Fargo Account, WELLS FARGO BANK received a benefit from these numerous transfers in form of transaction fees.

### The WELLS FARGO DEFENDANTS Close the Barn Door After the Horses Have Bolted

100.     Two weeks later, on July 31, 2015, WELLS FARGO BANK closed the FCC Wells Fargo Account, according to the account records for the FCC Wells Fargo Account, for "Loss Prevention."

101.     The following week, on August 6, 2015, WELLS FARGO BANK closed the FCP Wells Fargo Account and an account in the name of McConley, according to the account records for each account, both for "Loss Prevention."

102.     On September 20, 2015, the May 15, 2015 loan came due, but WVP failed to repay ADANA.

103.     ADANA then tried to contact RAFAEL, but received a bounce-back from his WELLS FARGO BANK email account on October 19, 2015.

104.     Unbeknownst to ADANA, WELLS FARGO BANK had terminated RAFAEL's employment on June 18, 2015, purportedly for excessive tardiness.

105.     Two days prior, on June 16, 2015, according to account records for the FCP Account, FCP transferred $250,000 to an account at Regions Banks in the name of Capital B, LLC. According to records filed with the Florida Secretary of State, Capital B, LLC is an entity controlled by RAFAEL.

106.     But, despite RAFAEL's termination, WELLS FARGO BANK failed to disable RAFAEL's email account at WELLS FARGO BANK for over one month.

107.    After June 18, 2015, and throughout June and July 2015, RAFAEL's email address at WELLS FARGO BANK continued to be copied on email communications between Burlingham and Vandermolen and the Forrest Capital Parties, but RAFAEL's email account did not trigger a bounce-back.

108.    Also, despite his termination, on July 14, 2015, WELLS FARGO BANK permitted RAFAEL to open an account in the name of his company, Capital B, LLC. As part of this process, RAFAEL signed a statement of entity ownership and control for Capital B, LLC . As a result, as of no later than July 14, 2015, WELLS FARGO BANK had knowledge that one of its customers, FCP, in the course of transferring millions of dollars through its accounts, transferred $250,000 to one of WELLS FARGO BANK's own employees.

109.    When ADANA demanded to speak with another representative of WELLS FARGO BANK, the Forrest Capital Parties offered to introduce ADANA to yet another one of their bankers, BERMUDEZ.

110.    ADANA has since learned that BERMUDEZ was instrumental in the conversion of ADANA's money from behind the scenes.

111.    WELLS FARGO BANK's internal records reveal that, as of May 15, 2015, BERMUDEZ was a banker linked with the "MCCONLEY, BENJAMIN & Forrest Capital Relationship." Prior to then and until May 15, 2015, WELLS FARGO BANK's internal records reveal that BERMUDEZ was linked with the "FORREST CAPITAL & COMPANY Relationship." It was ZOCH who removed BERMUDEZ from being linked with the FCC relationship.

112.    On    October    20,    2015,    McConley    emailed    BERMUDEZ    at hernan.bermudez@wellsfargo.com, and asked him to speak with ADANA "to confirm FCP accounts are in good standing and account management as we complete our project."

113.    A few weeks later, on November 6, 2015, WELLS FARGO BANK and/or WELLS FARGO ADVISORS terminated BERMUDEZ's employment. In reporting BERMUDEZ's termination to FINRA, WELLS FARGO ADVISORS provided the following reason: "Did not follow Bank's procedures relating to the opening of business bank accounts. Specifically, relied upon information received by email instead of speaking with or meeting with the account owners."

114.    Upon information and belief, BERMUDEZ opened the business bank accounts for FCC and/or FCP.

115.    As of the filing of this Complaint, the Forrest Capital Parties continue to deprive ADANA of its $28,542,500, plus over $9 million in interest. As of the filing of this Complaint, the Forrest Capital Parties owe ADANA in excess of $38 million with interest.

### The WELLS FARGO DEFENDANTS Have Had Knowledge of the Forrest Capital Parties' Fraudulent Scheme Since 2014

116.    ADANA is not the only victim of the Forrest Capital Parties' scheme.

117.    Since 2014, some combination of Van Eman, McConley, FCP, and FCC have been sued in no fewer than three civil actions, including twice in this District, for fraud, civil conspiracy, and/or conversion based on substantially similar film financing schemes. *See Anthony Buzbee v. Gayle Dickie, Jason Van Eman, Weathervane Productions, Inc., Forrest Capital Partners, Inc., Forrest Capital & Co., LLC, et al.*, Case No. 4:14-Cv-03431 (S.D. Tx.) (initial complaint filed in state court on Oct. 2, 2014); *Dane A. Miller v. Benjamin Forrest McConley*, Case No. 0:14-cv-62449-WPD (S.D. Fla.) (initial complaint filed on Oct. 28, 2014); *Superhuman International Pty Ltd. v. Benjamin Forrest McConley, Jason Van Eman, Forrest Capital, Partners, Inc., Weathervane Productions, Inc., et al.*, Case No. 1:15-cv-22690-CMA (S.D. Fla) (initial complaint filed on July 17, 2015).

118.    The WELLS FARGO DEFENDANTS and their employees were involved in each of the loans that precipitated these lawsuits.

119.    In the *Superhuman* case, the Forrest Capital Parties used RAFAEL as their banker.

120.    Whereas, in the *Miller* case, the Forrest Capital Parties used BERMUDEZ as their banker.

121.    In addition to the active participation of their officers and employees in the Forrest Capital Parties' conversion of other victims' funds, the WELLS FARGO DEFENDANTS have been on actual notice of allegations of fraud and conversion against FCC and FCP by virtue of being named defendants in the *Buzbee* case.

122.    On November 19, 2014, WELLS FARGO ADVISORS and WELLS FARGO BANK were added as defendants in the *Buzbee* case.

123.    On November 25, 2014, WELLS FARGO ADVISORS and WELLS FARGO BANK appeared in the *Buzbee* action, and were represented by the same attorney of record.

124.    On December 9, 2014, Buzbee filed a Motion for Preliminary Injunction that set forth the details of the Forrest Capital Parties' scheme.

125.    As of no later than December 9, 2014, WELLS FARGO ADVISORS and WELLS FARGO BANK received actual notice of the allegations of fraud and conversion against FCC and FCP, which involved the use of accounts at WELLS FARGO ADVISORS and WELLS FARGO BANK in the name of and/or controlled by FCC and FCP.

126.    Despite WELLS FARGO BANK's actual knowledge that the Forrest Capital Parties were using accounts in the names of FCC and FCP to defraud lenders and convert funds, WELLS FARGO BANK failed to sever its relationships with FCC, FCP, and McConley, close

their accounts in a timely manner, and/or prevent FCC, FCP, and McConley from opening new accounts with WELLS FARGO BANK.

127. In fact, on August 6, 2015, the very same day that WELLS FARGO BANK finally closed the FCP Wells Fargo Account and the McConley account for "Loss Prevention," BERMUDEZ assisted in the opening of an account in the name of an entity called, FCP Master Holdings LLC. Aaron McConley (Benjamin McConley's brother) was made the signatory. Upon information and belief, additional lenders have been defrauded by the FCP Parties through the same fraudulent film financing scheme with the use of this new FCP Master Holdings Account.

128. Upon information and belief, despite WELLS FARGO ADVISORS' actual knowledge that the Forrest Capital Parties were using accounts in the names of FCC and FCP to defraud lenders and convert funds, WELLS FARGO ADVISORS failed to sever its relationships with FCC, FCP, and McConley, close their accounts in a timely manner, and/or prevent FCC, FCP, and McConley from opening new accounts with WELLS FARGO ADVISORS.

129. All conditions precedent to the institution of this action have been met, occurred or waived.

## COUNT I
## AIDING AND ABETTING CONVERSION
### (AGAINST THE WELLS FARGO DEFENDANTS)

130. ADANA re-alleges paragraphs 1 through 129 above, as if fully set forth herein.

131. As of no later than September 20, 2015, pursuant to the May 15, 2015 Loan Agreement, ADANA has had the immediate right to possess the $15 million it deposited into the FCC Wells Fargo Account.

132. As of no later than October 25, 2015, pursuant to the June 22, 2015 Loan Agreement, ADANA has had the immediate right to possess the $2,242,500 million it deposited into the FCC Wells Fargo Account.

133.     As of no later than November 15, 2015, pursuant to the July 13, 2015 Loan Agreement, ADANA has had the immediate right to possess the $11.3 million it deposited into the FCC Wells Fargo Account.

134.     The $28,542,500 deposited into the FCC Wells Fargo Account is the property of ADANA.

135.     The Forrest Capital Parties are wrongfully asserting dominion and control over ADANA's property by misappropriating ADANA's $28,542,500 for their personal use and benefit.

136.     The Forrest Capital Parties' conversion of ADANA's $28,542,500 has permanently deprived ADANA of its property, causing financial injury and damage to ADANA.

137.     ADANA has demanded that the Forrest Capital Parties return the $28,542,500 to ADANA and, indeed, has already filed and vigorously prosecuted a lawsuit against the Forrest Capital Parties demanding the return of the $28,542,500, and the Forrest Capital Parties have refused thus far to do so. Any further attempts by ADANA to make demand upon Forrest Capital Parties for the return of its property would be futile.

138.     The Forrest Capital Parties have converted ADANA's $28,542,500 that was deposited into the FCC Wells Fargo Bank Account.

139.     At all times material hereto, ZOCH was acting in the scope of his employment as a Financial Advisor and Assistant Vice President and for the benefit of WELLS FARGO ADVISORS and/or WELLS FARGO BANK.

140.     At all times material hereto, BERMUDEZ was acting in the scope of his employment as a Regional Bank Private Banker and Assistant Vice President and for the benefit of WELLS FARGO ADVISORS and/or WELLS FARGO BANK.

141.    At all times material hereto, RAFAEL was acting in the scope of his employment as a banker and for the benefit of WELLS FARGO BANK.

142.    Upon information and belief, the WELLS FARGO DEFENDANTS provided substantial assistance to the Forrest Capital Parties in their conversion of ADANA's $28,542,500 by violating banking regulations, including the "Know Your Customer" requirements of the Bank Secrecy Act.

143.    The WELLS FARGO DEFENDANTS, through their officers and employees while acting within the scope of their employment as well as through their monitoring of employee emails, had knowledge of the Forrest Capital Parties' conversion of ADANA's funds.

144.    The WELLS FARGO DEFENDANTS, through their officers and employees while acting within the scope of their employment, actively provided substantial assistance to the Forrest Capital Parties in their conversion of ADANA's $28,542,500. As more fully described throughout this Complaint, the WELLS FARGO DEFENDANTS' substantial assistance included, without limitation, vouching for the legitimacy of the Forrest Capital Parties at meetings held in boardrooms at branches of both WELLS FARGO BANK and WELLS FARGO ADVISORS. In addition, WELLS FARGO BANK provided written assurances to ADANA that its loan proceeds would be secure. Further, WELLS FARGO BANK provided written assurances to ADANA that actively concealed the Forrest Capital Parties' conversion of the loan proceeds from the May 15, 2015 loan. This concealment, in turn, substantially assisted the Forrest Capital Parties' conversion of the loan proceeds from the June 22, 2015 and July 13, 2015 loans.

145.    The WELLS FARGO DEFENDANTS, by virtue of being named defendants in the *Buzbee* case, had actual knowledge of the Forrest Capital Parties' fraudulent film financing scheme.

146.    The WELLS FARGO DEFENDANTS provided substantial assistance to the Forrest Capital Parties in their conversion of ADANA's $28,542,500 by failing to shut down and/or prevent the opening of accounts in the name of and/or controlled by FCC and FCP after receiving actual knowledge that FCC and FCP were using their accounts at WELLS FARGO ADVISORS and WELLS FARGO BANK to perpetrate a fraudulent film financing scheme to convert lenders' funds.

147.    The WELLS FARGO DEFENDANTS' actions were willful, and have directly caused and continue to cause injury and damage to ADANA.

**WHEREFORE**, ADANA prays for a trial by jury and requests that this Court enter judgment in favor of ADANA and against the WELLS FARGO DEFENDANTS, jointly and severally; award ADANA compensatory damages and punitive damages in an amount to be determined at trial; award ADANA pre-judgment and post-judgment interest as allowed by law; and award ADANA such other and further relief as this Court may deem just and proper.

## COUNT II
## AIDING AND ABETTING CONVERSION
### (AGAINST RAFAEL)

148.    ADANA re-alleges paragraphs 1 through 129 above as if fully set forth herein.

149.    As of no later than September 20, 2015, pursuant to the May 15, 2015 Loan Agreement, ADANA has had the immediate right to possess the $15 million it deposited into the FCC Wells Fargo Account.

150.    As of no later than October 25, 2015, pursuant to the June 22, 2015 Loan Agreement, ADANA has had the immediate right to possess the $2,242,500 million it deposited into the FCC Wells Fargo Account.

151.    As of no later than November 15, 2015, pursuant to the July 13, 2015 Loan Agreement, ADANA has had the immediate right to possess the $11.3 million it deposited into the FCC Wells Fargo Account.

152.    The $28,542,500 deposited into the FCC Wells Fargo Account is the property of ADANA.

153.    The Forrest Capital Parties are wrongfully asserting dominion and control over ADANA's property by misappropriating ADANA's $28,542,500 for their personal use and benefit.

154.    The Forrest Capital Parties' conversion of ADANA's $28,542,500 has permanently deprived ADANA of its property, causing financial injury and damage to ADANA.

155.    ADANA has demanded that the Forrest Capital Parties return the $28,542,500 to ADANA and, indeed, has already filed and vigorously prosecuted a lawsuit against the Forrest Capital Parties demanding the return of the $28,542,500, and the Forrest Capital Parties have refused thus far to do so. Any further attempts by ADANA to make demand upon Forrest Capital Parties for the return of its property would be futile.

156.    The Forrest Capital Parties have converted ADANA's $28,542,500 that was deposited into the FCC Wells Fargo Bank Account.

157.    RAFAEL had knowledge of the Forrest Capital Parties' conversion of ADANA's funds.

158.    RAFAEL actively provided substantial assistance to the Forrest Capital Parties in their conversion of ADANA's $28,542,500. As more fully described throughout this Complaint, RAFAEL's substantial assistance included, without limitation, vouching for the legitimacy of the Forrest Capital Parties at meetings held at WELLS FARGO BANK, providing written assurances to ADANA that its loan proceeds would be secure, and providing written assurances

to ADANA that actively concealed the Forrest Capital Parties' conversion of the loan proceeds from the May 15, 2015 loan. This concealment, in turn, substantially assisted the Forrest Capital Parties' conversion of the loan proceeds from the June 22, 2015 and July 13, 2015 loans.

159.     RAFAEL's actions were willful, and have directly caused and continue to cause injury and damage to ADANA.

**WHEREFORE**, ADANA prays for a trial by jury and requests that this Court enter judgment in favor of ADANA and against RAFAEL; award ADANA compensatory damages and punitive damages in an amount to be determined at trial; award ADANA pre-judgment and post-judgment interest as allowed by law; and award ADANA such other and further relief as this Court may deem just and proper.

### COUNT III
### AIDING AND ABETTING CONVERSION
### (AGAINST ZOCH)

160.     ADANA re-alleges paragraphs 1 through 129 above, as if fully set forth herein.

161.     As of no later than September 20, 2015, pursuant to the May 15, 2015 Loan Agreement, ADANA has had the immediate right to possess the $15 million it deposited into the FCC Wells Fargo Account.

162.     As of no later than October 25, 2015, pursuant to the June 22, 2015 Loan Agreement, ADANA has had the immediate right to possess the $2,242,500 million it deposited into the FCC Wells Fargo Account.

163.     As of no later than November 15, 2015, pursuant to the July 13, 2015 Loan Agreement, ADANA has had the immediate right to possess the $11.3 million it deposited into the FCC Wells Fargo Account.

164.     The $28,542,500 deposited into the FCC Wells Fargo Account is the property of ADANA.

165.	The Forrest Capital Parties are wrongfully asserting dominion and control over ADANA's property by misappropriating ADANA's $28,542,500 for their personal use and benefit.

166.	The Forrest Capital Parties' conversion of ADANA's $28,542,500 has permanently deprived ADANA of its property, causing financial injury and damage to ADANA.

167.	ADANA has demanded that the Forrest Capital Parties return the $28,542,500 to ADANA and, indeed, has already filed and vigorously prosecuted a lawsuit against the Forrest Capital Parties demanding the return of the $28,542,500, and the Forrest Capital Parties have refused thus far to do so. Any further attempts by ADANA to make demand upon Forrest Capital Parties for the return of its property would be futile.

168.	The Forrest Capital Parties have converted ADANA's $28,542,500 that was deposited into the FCC Wells Fargo Bank Account.

169.	ZOCH had knowledge of the Forrest Capital Parties' conversion of ADANA's funds.

170.	ZOCH actively provided substantial assistance to the Forrest Capital Parties in their conversion of ADANA's $28,542,500. As more fully described throughout this Complaint, ZOCH's substantial assistance included, without limitation, vouching for the legitimacy of the Forrest Capital Parties at the meeting held at WELLS FARGO ADVISORS.

171.	ZOCH's actions were willful, and have directly caused and continue to cause injury and damage to ADANA.

**WHEREFORE**, ADANA prays for a trial by jury and requests that this Court enter judgment in favor of ADANA and against ZOCH; award ADANA compensatory damages and punitive damages in an amount to be determined at trial; award ADANA pre-judgment and post-

judgment interest as allowed by law; and award ADANA such other and further relief as this Court may deem just and proper.

## COUNT IV
## AIDING AND ABETTING CONVERSION
### (AGAINST BERMUDEZ)

172.    ADANA re-alleges paragraphs 1 through 129 above, as if fully set forth herein.

173.    At all times material hereto, BERMUDEZ was acting in the scope of his employment as a Regional Bank Private Banker and Assistant Vice President and for the benefit of WELLS FARGO ADVISORS and/or WELLS FARGO BANK.

174.    As of no later than September 20, 2015, pursuant to the May 15, 2015 Loan Agreement, ADANA has had the immediate right to possess the $15 million it deposited into the FCC Wells Fargo Account.

175.    As of no later than October 25, 2015, pursuant to the June 22, 2015 Loan Agreement, ADANA has had the immediate right to possess the $2,242,500 million it deposited into the FCC Wells Fargo Account.

176.    As of no later than November 15, 2015, pursuant to the July 13, 2015 Loan Agreement, ADANA has had the immediate right to possess the $11.3 million it deposited into the FCC Wells Fargo Account.

177.    The $28,542,500 deposited into the FCC Wells Fargo Account is the property of ADANA.

178.    The Forrest Capital Parties are wrongfully asserting dominion and control over ADANA's property by misappropriating ADANA's $28,542,500 for their personal use and benefit.

179.    The Forrest Capital Parties' conversion of ADANA's $28,542,500 has permanently deprived ADANA of its property, causing financial injury and damage to ADANA.

28

180.     ADANA has demanded that the Forrest Capital Parties return the $28,542,500 to ADANA and, indeed, has already filed and vigorously prosecuted a lawsuit against the Forrest Capital Parties demanding the return of the $28,542,500, and the Forrest Capital Parties have refused thus far to do so. Any further attempts by ADANA to make demand upon Forrest Capital Parties for the return of its property would be futile.

181.     The Forrest Capital Parties have converted ADANA's $28,542,500 that was deposited into the FCC Wells Fargo Bank Account.

182.     BERMUDEZ had knowledge of the Forrest Capital Parties' conversion of ADANA's funds.

183.     BERMUDEZ actively provided substantial assistance to the Forrest Capital Parties in their conversion of ADANA's $28,542,500. As more fully described throughout this Complaint, BERMUDEZ's provide substantial assistance by managing the FCP Account with the knowledge that it would be used for fraudulent deals.

184.     BERMUDEZ's actions were willful, and have directly caused and continue to cause injury and damage to ADANA.

**WHEREFORE**, ADANA prays for a trial by jury and requests that this Court enter judgment in favor of ADANA and against BERMUDEZ; award ADANA compensatory damages and punitive damages in an amount to be determined at trial; award ADANA pre-judgment and post-judgment interest as allowed by law; and award ADANA such other and further relief as this Court may deem just and proper.

### COUNT V
### FRAUDULENT MISREPRESENTATION
### (AGAINST WELLS FARGO BANK)

185.     ADANA re-alleges paragraphs 1 through 129 above, as if fully set forth herein.

186.    At all times material hereto, ZOCH was acting in the scope of his agency and/or employment as a Financial Advisor and Assistant Vice President and for the benefit of WELLS FARGO BANK.

187.    At all times material hereto, RAFAEL was acting in the scope of his employment as a banker and for the benefit of WELLS FARGO BANK.

188.    As described herein, the Forrest Capital Parties' perpetrated a scheme to convert ADANA's property.

189.    In furtherance of the Forrest Capital Parties' scheme, WELLS FARGO BANK, through RAFAEL and ZOCH, made material false statements and representations, including, without limitation, those statements and representations set forth in paragraphs 37-43, 46, 51-56, 59-61, 66-72, 79, and 85.

190.    WELLS FARGO BANK, through RAFAEL and ZOCH, intended ADANA to act on the knowingly false representations set forth in paragraphs 37-43, 46, 51-56, 59-61, 66-72, 79, and 85.

191.    At the time, ADANA did not know the statements and representations set forth in paragraphs 37-43, 46, 51-56, 59-61, 66-72, 79, and 85 were false.

192.    ADANA justifiably relied to its detriment upon the statements and representations made by WELLS FARGO BANK through RAFAEL and ZOCH.

193.    As a direct and proximate result of WELLS FARGO BANK, through RAFAEL and ZOCH, making the statements and representations set forth in paragraphs 37-43, 46, 51-56, 59-61, 66-72, 79, and 85, ADANA has sustained injury and damage in excess of $38 million with interest as of the date of the filing of the complaint, and continues to be injured and damaged.

WHEREFORE, ADANA prays for a trial by jury and requests that this Court enter judgment in favor of ADANA and against WELLS FARGO BANK; award ADANA compensatory damages and punitive damages in an amount to be determined at trial; award ADANA pre-judgment and post-judgment interest as allowed by law; and award ADANA such other and further relief as this Court may deem just and proper.

**COUNT VI**
**FRAUDULENT MISREPRESENTATION**
**(AGAINST WELLS FARGO ADVISORS)**

194.     ADANA re-alleges paragraphs 1 through 129 above, as if fully set forth herein.

195.     At all times material hereto, ZOCH was acting in the scope of his employment as a Financial Advisor and Assistant Vice President and for the benefit of WELLS FARGO ADVISORS.

196.     As described herein, the Forrest Capital Parties' perpetrated a scheme to convert ADANA's property.

197.     In furtherance of the Forrest Capital Parties' scheme, WELLS FARGO ADVISORS, through ZOCH, made material false statements and representations, including, without limitation, those statements and representations set forth in paragraphs 37 through 42.

198.     WELLS FARGO ADVISORS, through ZOCH, intended ADANA to act on the knowingly false representations set forth in paragraphs 37 through 42.

199.     At the time, ADANA did not know the statements and representations set forth in paragraphs 37 through 42 were false.

200.     ADANA justifiably relied to its detriment upon the statements and representations made by WELLS FARGO ADVISORS through ZOCH.

201.     As a direct and proximate result of WELLS FARGO ADVISORS, through ZOCH, making the statements and representations set forth in paragraphs 37 through 42,

ADANA has sustained injury and damage in excess of $38 million with interest as of the date of the filing of the complaint, and continues to be injured and damaged.

**WHEREFORE**, ADANA prays for a trial by jury and requests that this Court enter judgment in favor of ADANA and against WELLS FARGO ADVISORS; award ADANA compensatory damages and punitive damages in an amount to be determined at trial; award ADANA pre-judgment and post-judgment interest as allowed by law; and award ADANA such other and further relief as this Court may deem just and proper.

**COUNT VII**
**FRAUDULENT MISREPRESENTATION**
**(AGAINST RAFAEL)**

202.    ADANA re-alleges paragraphs 1 through 129 above, as if fully set forth herein.

203.    As described herein, the Forrest Capital Parties' perpetrated a scheme to convert ADANA's property.

204.    In furtherance of the Forrest Capital Parties' scheme, RAFAEL made material false statements and representations, including, without limitation, those statements and representations set forth in paragraphs 43, 46, 51-56, 59-61, 66-72, 79, and 85.

205.    RAFAEL intended ADANA to act on the knowingly false representations set forth in paragraphs 43, 46, 51-56, 59-61, 66-72, 79, and 85.

206.    At the time, ADANA did not know the statements and representations set forth in paragraphs 43, 46, 51-56, 59-61, 66-72, 79, and 85 were false.

207.    ADANA justifiably relied to its detriment upon the statements and representations made by RAFAEL.

208.    As a direct and proximate result of RAFAEL making the statements and representations set forth in paragraphs 43, 46, 51-56, 59-61, 66-72, 79, and 85, ADANA has

sustained injury and damage in excess of $38 million with interest as of the date of the filing of the complaint, and continues to be injured and damaged.

WHEREFORE, ADANA prays for a trial by jury and requests that this Court enter judgment in favor of ADANA and against RAFAEL; award ADANA compensatory damages and punitive damages in an amount to be determined at trial; award ADANA pre-judgment and post-judgment interest as allowed by law; and award ADANA such other and further relief as this Court may deem just and proper.

## COUNT VIII
## FRAUDULENT MISREPRESENTATION
### (AGAINST ZOCH)

209.    ADANA re-alleges paragraphs 1 through 129 above, as if fully set forth herein.

210.    As described herein, the Forrest Capital Parties' perpetated a scheme to convert ADANA's property.

211.    In furtherance of the Forrest Capital Parties' scheme, ZOCH made material false statements and representations, including, without limitation, those statements and representations set forth in paragraphs 37 through 42.

212.    ZOCH intended ADANA to act on the knowingly false representations set forth in paragraphs 37 through 42.

213.    At the time, ADANA did not know the statements and representations set forth in paragraphs 37 through 42 were false.

214.    ADANA justifiably relied to its detriment upon the statements and representations made by ZOCH.

215.    As a direct and proximate result of ZOCH making the statements and representations set forth in paragraphs 37 through 42, ADANA has sustained injury and damage

in excess of $38 million with interest as of the date of the filing of the complaint, and continues to be injured and damaged.

   **WHEREFORE**, ADANA prays for a trial by jury and requests that this Court enter judgment in favor of ADANA and against ZOCH; award ADANA compensatory damages and punitive damages in an amount to be determined at trial; award ADANA pre-judgment and post-judgment interest as allowed by law; and award ADANA such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

   Plaintiff hereby demands a trial by jury in this action on all issues triable by a jury.

Dated:  May 2, 2016                  Respectfully submitted,

                          KOBRE & KIM LLP

                          /s/   John D. Couriel
                          John D. Couriel
                          Fla. Bar No. 831271
                          Stephanie L. Hauser
                          Fla. Bar No. 92765
                          2 South Biscayne Boulevard
                          Miami, FL 33131
                          Tel: +1 305 967 6100
                          Fax: +1 305 967 6120
                          john.couriel@kobrekim.com
                          stephanie.hauser@kobrekim.com

                          *Attorneys for Plaintiff Adana Investing, Inc.*