UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

ADANA INVESTING, INC.,

     Plaintiff,

                                  Case No.:

v.                              16-CIV-21562-UNGARO/GOODMAN

WELLS FARGO BANK, N.A.,
WELLS FARGO ADVISORS, LLC,
BENJAMIN RAFAEL,
HERNAN BERMUDEZ,
and PAUL ZOCH,

     Defendants.
_____/

**DEFENDANT WELLS FARGO BANK, N.A.'S
MOTION TO DISMISS COUNTS I AND V OF PLAINTIFF'S COMPLAINT,
AND INCORPORATED MEMORANDUM OF LAW**

Defendant Wells Fargo Bank, N.A. ("**Wells Fargo**"), through its counsel, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill & Mullis, P.A. and pursuant to Federal Rule of Civil Procedure 12(b)(6) and Rule 7.1 of the Rules for the United States District Court for the Southern District of Florida, moves to dismiss the claims asserted against it in Counts I and V of the complaint filed by plaintiff Adana Investing, Inc. ("Plaintiff").

**I.      PRELIMINARY STATEMENT**

Plaintiff sues Wells Fargo, its affiliate Wells Fargo Advisors, LLC ("**Advisors**"), and others seeking to recover $28 million in principal and $9 million in interest Plaintiff claims it is owed on three loans Plaintiff made to non-party WVP Holding, LLC ("**WVP**") in May, June and July, 2015. According to the complaint, Plaintiff made the loans so WVP could pledge the proceeds to Wells Fargo as collateral securing a credit line for WVP affiliate Weathervane

Productions, Inc. ("**Weathervane**") to use as "permanent financing" for production of three films.  Plaintiff contends it was fraudulently induced into making the loans; there was never any credit line to be extended by Wells Fargo to Weathervane; the principals of Plaintiff's borrower absconded with the loan proceeds; and Wells Fargo's former employees, defendants Benjamin Rafael ("**Rafael**") and Hernan Bermudez ("**Bermudez**"), and Advisor's current employee, defendant Paul Zoch[1], were complicit in the fraud.

The complaint fails to state a claim against Wells Fargo.  Instead, it describes an ill-fated ploy in which Plaintiff made criminally-usurious loans designed to deceive Wells Fargo into extending a $100 million secured line of credit based on the illusion the would-be borrower had sufficient cash collateral, when in fact the collateral was nothing more than proceeds of 125-day-term loans made by Plaintiff.  Plaintiff's attempt to collect its usurious loans from Wells Fargo by claiming Rafael and Bermudez participated in the ruse is equally ill-fated.  Even if they did participate in the ploy, it is apparent from the complaint they did so to serve their own self-interest rather than Wells Fargo's interests.  Thus, any knowledge or intent they may have had, and any conduct in which they engaged, cannot be imputed to Wells Fargo.  Because Plaintiff participated in the scheme, the doctrine of *in pari delicto* forecloses any relief from Wells Fargo—the intended victim in the scheme.

The complaint also fails to allege essential elements of claims for aiding and abetting conversion and fraudulent misrepresentation.  It states no claim for aiding-and-abetting

---

1.  Plaintiff alleges Mr. Zoch is an employee of Advisors "and/or" Wells Fargo (Compl. ¶ 19), but Mr. Zoch is Advisors' employee, not Wells Fargo's.  Even if Mr. Zoch were a Wells Fargo employee, his alleged statements and conduct cannot be imputed to Wells Fargo for the reasons described herein.  See infra at pp. 10-12.  Also, Wells Fargo does not concede that any of its employees did anything wrong. With respect to Mr. Bermudez, Plaintiff does not even allege he had any involvement at all other than having opened accounts before Plaintiff entered into its loan transactions.

conversion because its allegations negate the conclusion that Plaintiff was entitled to possession of the funds Plaintiff loaned to WVP to pledge to Wells Fargo.  Similarly, the complaint does not state a claim for fraudulent misrepresentation because it fails to allege facts to support the conclusion that Wells Fargo made any actionable representation to Plaintiff, and alleges facts that negate the essential element of actual reliance.  In sum, Plaintiff's claims—that Wells Fargo is liable to Plaintiff for a $38 million fraud in which Wells Fargo supposedly participated solely to receive ordinary-course account transaction fees generated by fund transfers—are not just implausible, they are inconceivable.  Accordingly, Counts I and V of Plaintiff's complaint fail to state a claim, and should be dismissed.

## II.    PLAINTIFF'S COMPLAINT

Plaintiff  identifies itself as a British Virgin Islands corporation, see Compl. ¶ 3, but does not identify any of its principals, employees or other agents.  Instead, it refers cryptically to two individuals, Alastair Burlingham and Lee Vandermolen, who are alleged to have "relayed to [Plaintiff] the details of due diligence that they had conducted recently into [WVP and its affiliates'] relationship and standing with Wells Fargo" and Advisors, on which information Plaintiff "in turn, relied."   See id at ¶¶ 35-36.   The complaint includes no other allegations concerning the relationship between Plaintiff and Messrs. Burlingham or Vandermolen.

The complaint alleges WVP and Weathervane and two other entities, Forrest Capital Partners, Inc. ("**FCP**"), and Forrest Capital and Co., LLC ("**FCC**"), were controlled by Benjamin McConley and Jason Van Eman, and refers collectively to WVP, Weathervane, FCP, FCC and Messrs. McConley and Van Eman as "the Forrest Capital Parties" (the "**FC Parties**") throughout.  Compl. ¶ 29.

Plaintiff claims it was first approached by the FC Parties in January 2015 about making a short term loan to WVP.  Id. at ¶ 30.  According to Plaintiff, the FC Parties explained: Weathervane had an opportunity to produce three films but needed a line of credit for permanent financing.  Id.  Wells Fargo was poised to extend the line of credit, but Weathervane needed to put up collateral.  Id. at ¶¶ 30 and 34.  "FCP had already committed to provide half the collateral needed, but [] before FCP could do so, FCP's charter required Weathervane as the borrower to secure 'matched funding' equal to the amount to be contributed by FCP."  Id. at ¶ 31.  To obtain the permanent financing from Wells Fargo, "the FC Parties proposed that [Plaintiff] make a short-term loan to WVP, a special purpose vehicle created by Weathervane.  WVP would then use the [Plaintiff's] loan proceeds as the 'matched funding' portion of the collateral to obtain the line of credit to be used as permanent financing for the production of the films."  Id. at ¶ 32.

Plaintiff claims it was unwilling to proceed "without first receiving confirmation from FCP's bank of FCP's ability to provide its portion of the collateral needed by WVP, as well as assurances as to [the FC Parties'] relationship and standing with the bank that was to issue the line of credit."  Id. at ¶ 33.  The FC Parties had told Plaintiff that their banking relationship was with Wells Fargo Bank through Advisors' private banking services.  See id. at ¶ 34.  But for reasons unexplained, Plaintiff did not conduct any independent inquiry to Wells Fargo.  Instead, Plaintiff claims to have relied on Messrs. Burlingham and Vandermolen to recount "details of due diligence that they had conducted recently into the [FC Parties'] relationship and standing with Wells Fargo."  Id. at ¶ 36.

The complaint describes the "due diligence" in which Messrs. Burlingham and Vandermolen (hereinafter "**B&V**") engaged as follows:  In late October 2014, three months before Plaintiff was even first approached by the FC Parties, at a meeting in Fort Lauderdale,

4

B&V were introduced by Messrs. McConley and Van Eman to Mr. Zoch, "who represented himself to be FCP's banker and financial advisor at" Advisors.  Compl. ¶¶ 35-38.  Mr. Zoch allegedly told B&V that "(1) FCP and [Mr.] McConley were clients of [Advisors]; (2) [Advisors] administered and managed the trust assets of FCP's family office; and (3) FCP's family office had assets of hundreds of millions of dollars."  Id. at ¶ 39.  Mr. Zoch also allegedly told B&V that Wells Fargo and Advisors "had been involved in similar film financing deals between the [FC Parties] and other lenders that were successfully completed" and "FCP had $100 million in assets with [Advisors] that was dedicated to investing in Weathervane's film financing projects." Id. at ¶ 41.

"Subsequently, after the contemplated transaction had advanced," B&V had two more meetings with the FC Parties in mid-March 2015, in Miami.  Id. at ¶ 43.  At the first meeting Messrs. McConley and Van Eman introduced B&V to Rafael, "who identified himself as the [FC Parties'] banker," and to "[a]nother unidentified individual who introduced herself" as Rafael's manager. Id.  Rafael allegedly represented to B&V that Mr. McConley and FCP "were clients in good standing of Wells Fargo;"  Wells Fargo [] would be able to issue a line of credit within 90 days" of Plaintiff's loan to WVP, and that Plaintiff's "loan proceeds would be held in a restricted account." Id. at ¶ 46.  The complaint does not identify or describe the account, or allege what restrictions would be imposed, when they would be put in place, how long they would remain in effect, or whose interests such restrictions would serve.

The second March 2015 meeting was attended by yet "another unidentified officer" of Wells Fargo.  Compl. ¶¶ 48-50.  At that meeting, the complaint alleges, "Rafael and the unidentified officer represented" to B&V that: "(1) FCP had substantial assets at [Wells Fargo and Advisors]; (2) Wells Fargo "would be willing to provide up to $100 million of collateralized

loan exposure for FCP; and (3) should [Plaintiff] agree to lend the funds to WVP, [Wells Fargo] would hold [Plaintiff's] loan proceeds in restricted accounts." Id. at ¶ 51. Again, the complaint does not identify or describe the proposed accounts, what restrictions would be imposed, when or for how long, or whose interests the restrictions would serve.

Plaintiff alleges that B&V's "due diligence" meetings "were critical in convincing [Plaintiff] to agree to make the short-term loans to WVP." Compl. ¶ 54. Yet nowhere does the complaint describe Plaintiff's relationship to B&V or allege when B&V "relayed" information about their "due diligence" to any principal, employee or other agent of Plaintiff, or allege which principal, employee or other agent of Plaintiff considered that information and acted in reliance thereon.

Additionally, Plaintiff claims it "relied heavily" on Wells Fargo's and Advisor's alleged "representations that FCP had assets sufficient to provide its portion of the collateral," and "representations about their prior and continuing involvement with the [FC Parties'] film financing deals," including [Wells Fargo's] extending millions of dollars in lines of credit to FCP, and Advisors['] working with [Wells Fargo] to collateralize those lines of credit with FCP's brokerage accounts with WFA." Id. at ¶¶ 55-56. According to Plaintiff, "[t]hese representations, in particular, were critical in convincing [Plaintiff] that the [FC Parties] were legitimate film producers that had successfully completed similar deals before, and that the [FC Parties] had sufficient assets to complete the proposed deals with" Plaintiff. Id. at ¶ 56. Significantly, however, the complaint fails to attribute these representations to any individuals, or to describe when, how or to whom these "particular[ly] critical" representations were made.

Similarly, the complaint asserts that Plaintiff "considered [Wells Fargo's and Advisor's] participation in the forthcoming deals to be a substantial basis for [Plaintiff's] confidence in the

legitimacy of the transactions and the security of the loan proceeds because (1) [Plaintiff] understood [Wells Fargo and WFA] to have undertaken measures standard in the industry to ensure that its banking clients were who and what they purported to be; and (2) because [Plaintiff] understood the bankers with whom [B&V] spoke . . . to be acting on behalf of" Wells Fargo and Advisors. Compl. ¶ 57.  But the complaint does not allege Plaintiff itself actually spoke to anyone at Wells Fargo before it made the loans, and it alleges nothing to support the conclusion that Plaintiff "understood" such matters based on anything but Plaintiff's own assumptions.

Even if the complaint contained allegations to support conclusions that Plaintiff "relied heavily" on "critical" representations left unidentified in the complaint, and on the "due diligence" conducted by B&V, its remaining allegations negate those conclusions because Plaintiff alleges that before Plaintiff would execute a loan agreement with WVP, Plaintiff "required written assurance from [Wells Fargo] that the loan proceeds would be secure." Id. at ¶ 59.  Yet again, instead of actually getting any such "assurance" directly from Wells Fargo, Plaintiff contends it relied on a letter it received from FCP principal Mr. Van Eman on May 13, 2015.  See Compl. ¶¶ 59-61.  The letter is not included as an exhibit to the complaint.  It is described only as having been on Wells Fargo letterhead, dated May 12, 2015, signed by Rafael purportedly as "Duly authorised [sic] signatory for and on behalf of" Wells Fargo, and "confirm[ed] that [Wells Fargo] would open an account to hold [Plaintiff's] loan proceeds, and that [Plaintiff's] loan proceeds would not be removed from the account without [Plaintiff's] express consent."  Id. at ¶ 60.  The complaint does not reveal to whom the letter was addressed, nor does it quote the language Plaintiff contends "confirmed" Wells Fargo's purported promises

to open an account to hold proceeds of Plaintiff's loan to WVP and to ensure no funds could be removed without Plaintiff's consent.

Two days later, on May 15, 2015, Plaintiff funded its first loan to WVP.  Rather than alleging it deposited the loan's proceeds into the restricted account Wells Fargo was to establish, Plaintiff alleges it deposited the proceeds "into an account in the name of FCC"[2] as it was instructed by WVP.  Compl. ¶ 63.   The complaint does not allege Wells Fargo played any part in Plaintiff's decision to deposit the proceeds into FCC's account, or that FCC's account was the purported restricted account.  Although the complaint alleges Plaintiff sought confirmation that the proceeds "had been received and the restrictions were in place" (id. at ¶ 65), the confirmation was sought almost two weeks after Plaintiff followed WVP's instructions.  By June 2, 2015, FCC had transferred $13.7 million out of its account to FCP, and by June 4, had made three additional transfers to FCP, bringing that total to $16,400,000.  Id. at ¶¶ 74-77.

Purportedly relying on "the successful start to the May 15, 2015 loan transaction," and apparently having forgotten about signature cards Plaintiff was to have received (but never received) for the restricted account, on June 22, 2015 Plaintiff funded a second 125-day loan to WVP, again following WVP's instruction to deposit the proceeds into FCC's account.  Compl. ¶¶ 79-81, 84, and 86-88.  On July 13, 2015 Plaintiff funded its third 125-day loan to WVP, and again followed WVP's instruction to deposit the proceeds to FCC's account.  Id. at ¶¶ 90-96. Nowhere does the complaint explain how three 125-day loans could serve as long-term collateral for the permanent financing Wells Fargo was supposedly going to provide.

On September 20, 2015, WVP failed to repay Plaintiff the first loan.  Compl. ¶ 102. Plaintiff asserts it "then tried to contact" Rafael through unspecified persons and means, but

---

[2] FCC refers to Forrest Capital and Co., LLC.  Compl. ¶ 29.

"received a bounce-back from his [Wells Fargo] email account on October 19, 2015." Id. at ¶ 103. After Plaintiff demanded the FC Parties put Plaintiff in touch with someone else at Wells Fargo, Mr. McConley emailed Bermudez asking him to confirm to Plaintiff that "FCP accounts are in good standing and account management as we complete our project." Plaintiff does not allege that Mr. Bermudez made any misrepresentation. Plaintiff alleges only that Mr. Bermudez had opened accounts for FCC and FCP and opened another business account on which Mr. McConley's brother was a signer, and until mid-May 2015 had been linked in Wells Fargo's internal records "with the [FCC] Relationship." Id. at ¶¶ 111, 114 and 127. On this basis, and based on allegations made in lawsuits filed in 2014 against the FC Parties, which Plaintiff contends put Wells Fargo "on actual notice of allegations of fraud and conversion" against FCC and FCP, Plaintiff leaps to the conclusion that Bermudez "was instrumental in the conversion of [Plaintiff's] money from behind the scenes." Id. at ¶ 110.

Upon these contentions Plaintiff seeks to hold Wells Fargo liable for $28,542,500—the principal amount of its loans to WVP—and for more than $9 million that Plaintiff alleges had accrued on that principal as of May 2016. See Compl. ¶ 115. Plaintiff did not attach copies of its loan agreements to the complaint, but based on the interest Plaintiff claims it is due, those documents provide for an effective annual interest rate of 31.7%, which constitutes criminal usury and renders Plaintiff's loans wholly unenforceable, as to both interest and principal, pursuant to Florida Statutes § 687.071(7).

### III.   **ARGUMENT**

A complaint's factual allegations must state a plausible basis for the plaintiff's entitlement to the relief sought. Ashcroft v Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief."' Id. at 1950.

Under Federal Rule of Civil Procedure 8(a), "well-pleaded facts" do not include either conclusions of law or statements of mixed fact and law that are unsupported by specific allegations of facts; such conclusions and statements "have long been recognized not to prevent a Rule 12(b)(6) dismissal." Marsh v. Butler County, Alabama, 268 F.3d 1014, 1036 and n.17 (11th Cir. 2001). In considering a motion to dismiss for failure to state a claim, this Court is not required to "'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions and the like need not be credited."' Gross v. White, 2008 U.S. Dist. LEXIS 65432 at *4 (M.D. Fla. July 18, 2008), aff'd, 340 F. App'x 527 (11th Cir. July 17, 2009). Plaintiff's complaint is long on conclusions, but woefully short on the facts required to support those conclusions and state legally sufficient claims. And the facts that are alleged in the compliant negate any claim Plaintiff otherwise might have pled.

A. **The Claims in Counts I and V Are Barred on the Face of the Complaint by the Adverse Interest Exception to Imputation and the Doctrine of _In Pari Delicto_.**

The claims against Wells Fargo are barred on the face of the complaint as a matter of well-settled Florida agency law. Wells Fargo's employees' alleged misconduct cannot be imputed to Wells Fargo, because the complaint demonstrates the alleged conduct of the employees—if it occurred—was undertaken for their own interests adverse to the interests of Wells Fargo. Moreover, even if the employees' alleged misconduct could be imputed to Wells Fargo, Plaintiff's claims are barred on the face of the complaint by the doctrine of *in pari delicto*.

1.  <u>**The Bank Employees' Alleged Misconduct Cannot Be Imputed to Wells Fargo.**</u>

"Florida law prohibits attributing the acts of a corporate officer to the corporation where the officer acts outside of his authority or adversely to the interests of the corporate entity. [K]nowledge and conduct of an agent will not be imputed to a principal if an agent is secretly … acting adversely to the principal and entirely for his own or another's purposes." <u>Golden Door Jewelry Creations v. Lloyds Underwriters Non-Marine Ass'n</u>, 117 F.3d 1328, 1338-39 (11th Cir. 1997).  Where a pleading on its face demonstrates that a party's agent was acting for the agent's personal interest adversely to the party-principal, the agent's knowledge and conduct will not be imputed to the principal.  <u>See</u> <u>Nerbonne N.V. v. Lake Bryan Int'l Props.</u>, 685 So. 2d 1029, 1031 (Fla. 5th DCA 1997) (holding that complaint's allegations required conclusion that agents acted for their own interests adverse to those of their principal, and barred imputation).

The complaint establishes if Rafael and Bermudez engaged in the conduct alleged, they would have been acting outside the scope of their employment with Wells Fargo in saying and doing what the complaint alleges they said and did.  Although the complaint includes specific allegations concerning the respective duties and responsibilities of Rafael and Bermudez, <u>see</u> Compl. ¶¶ 16 and 25, there are no allegations to establish they had duties or responsibilities that plausibly could have conferred upon them actual or apparent authority to make the representations alleged in the complaint.  <u>See</u> <u>id</u>. (alleging that employees' duties included "providing advice to customers," not to non-customers or even prospective customers) <u>and compare</u> Compl. ¶¶ 46, 51, 60, 70 and 85.

Nor is Rafael—a personal banker who lacked any officer or commercial banker designation—alleged to have had duties or responsibilities that plausibly could have conferred upon him actual or apparent authority to make any of the statements or engage in any of the

conduct attributed to him in the complaint.  See Compl. ¶ 16.  The complaint describes Rafael's role at Wells Fargo in terms of "selling retail banking products and services to customers and prospective customers."  See Compl. ¶ 18.  Plaintiff's allegations render it inconceivable that Rafael had actual or apparent authority to promise non-customers like Plaintiff and B&V that Wells Fargo would restrict commercial customers' (like FCC's) access to their deposit accounts to benefit or protect strangers like Plaintiff.

Even if B&V or Plaintiff plausibly could have believed Rafael had authority to speak and act for Wells Fargo in matters concerning non-customers' dealings with Wells Fargo's commercial customers, Plaintiff has stated no claim against Wells Fargo.  The allegations relating to Rafael establish a single purpose:  to trick Wells Fargo into extending a $100 million line of credit, even though one-half of the purported cash collateral pledged to secure that line was mere loan proceeds due to be repaid to Plaintiff within 125 days with interest at nearly 32%. Wells Fargo could not possibly have benefited from such a proposed transaction, and Rafael's alleged statements and conduct therefore cannot be imputed to Wells Fargo as a matter of law.

**2.  Plaintiff's Claims Are Barred Under the Doctrine of *In Pari Delicto*.**

The doctrine of *in pari delicto* is founded on equitable principles:  In a case of equal or mutual fault . . . the position of the [defending] party . . . is the better one."  Official Comm. of Unsecured Creditors of PSA, Inc. v. Edwards, 437 F.3d 1145, 1152 (11th Cir. 2006) (affirming dismissal of RICO claims as barred by *in pari delicto*) (alteration in original).  The doctrine "is based on the policy that courts should not lend their good offices to mediating disputes among wrongdoers," and "denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality."  Id.  *In pari delicto* is an affirmative defense that warrants dismissal of a complaint when its allegations show the doctrine applies to bar recovery on the claims asserted.

See Luzinski v. Peabody & Arnold LLP (In re Gosman), 382 B.R. 826 (S.D. Fla. 2007) (affirming bankruptcy court's dismissal of adversary complaint where *in pari delicto* defense appeared on the face of the complaint).

"Under Florida law, the doctrine of *in pari delicto* operates to bar legal remedies when both parties are equally in the wrong, or where the plaintiff had greater responsibility for the wrongdoing than defendant." Id. at 837-838. Furthermore, ""[e]ven if the parties did not participate in the *same* wrongdoing, Florida also follows a general principle that no one shall be permitted to profit by his own fraud, or take advantage of his own wrong, or found any claim upon his own iniquity, or profit by his own crime."" Id. at 838 (emphasis in original).

Plaintiff's complaint establishes that Plaintiff joined with the FC Parties in an attempted ruse to induce Wells Fargo to provide permanent financing secured by cash collateral comprised of funds the FC Parties borrowed from Plaintiff for just long enough–125 days–to get the line opened. See Compl. ¶¶ 30-32 and 46. Plaintiff's role in the transaction was to help the FC Parties defraud Wells Fargo. See, e.g., 18 U.S.C. § 1344 (defining criminal bank fraud as including attempt to execute a scheme to obtain credit from a financial institution by means of false pretenses); U.S. v. Teers, 591 F. App'x 824, 827-829 and 842-845 (11th Cir. 2014) (affirming conviction of broker for aiding and abetting customer's bank fraud, where evidence supported finding that broker knew that at time bank opened customer's line of credit customer did not own bonds that were to have been pledged as collateral, and that customer planned to use funds drawn on the credit line to purchase those bonds).

Additionally, the damages Plaintiff seeks from Wells Fargo consist of the principal and interest Plaintiff claims it is due on the three 125-day loans. Plaintiff's complaint alleges that as of the date it was filed, May 2, 2016, Plaintiff was due "in excess of $38 million," which

includes $28,542,500 in principal "plus over $9 million in interest."  Compl. ¶ 115.  If $9 million in interest was due on principal of $28,542,500 advanced less than one year before the complaint was filed, then Plaintiff's loans have an effective annual interest rate of 31.7%.

Florida's usury laws prescribe a maximum rate of interest of 25 percent on loans that exceed $500,000.  Fla. Stat. § 687.071(2).  It is a criminal offense—a second degree misdemeanor—to knowingly provide a loan that has an effective annual interest rate between 25 and 44 percent.  Id.  ("any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 25 percent per annum but not in excess of 45 percent per annum, or the equivalent rate for a longer or shorter period of time, whether directly or indirectly, or conspires so to do, commits a misdemeanor of the second degree, punishable as provided in s. 775.082 or s. 775.083").  The economic consequences of a criminally usurious loan are significant:  the entire debt becomes unenforceable, and the lender is prohibited even from recovering the principal of the loan.  See Fla. Stat. § 687.071(7) (no extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state); see also, e.g., Velletri v. Dixon, 44 So. 3d 187 (Fla. 2d DCA 2010) (borrower's remedy for criminally usurious loan was cancellation of debt in its entirety).

Under the doctrine of *in pari delicto*, Plaintiff cannot recover from Wells Fargo via common law tort theories damages arising from transactions that are illegal and unenforceable under federal and Florida law.

## B.  Counts I and V Fail to Allege Essential Elements of Plaintiff's Claims.

If Plaintiff's claims survive application of the adverse interest exception and the doctrine of *in pari delicto*, Counts I and V of the complaint nonetheless should be dismissed.

1. __The Complaint Fails to State a Claim for Aiding and Abetting Conversion.__

To state an aiding and abetting claim, a plaintiff must plead facts to show an underlying tort by the principal wrongdoer; the defendant's knowledge of the underlying tort; and the defendant's rendering of substantial assistance in the commission of the wrongdoing.  Lawrence v. Bank of Am., N.A., 455 F. App'x. 904, 906 (11th Cir. 2012)).  A claim for aiding and abetting fails if the plaintiff fails to plead adequately the underlying tort on which the claim is based.  Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1067 (11th Cir. 2007).

Count I purports to assert a claim against Wells Fargo for aiding and abetting the FC Parties' alleged conversion of the proceeds of Plaintiff's loans to WVP.    See Compl. ¶¶ 130-146.  To state a claim for aiding and abetting conversion, the complaint must adequately plead the underlying tort of conversion.  It does not.

Conversion is the unjustified interference with the plaintiff's right to possession of specific property.  See U.S. v. Bailey, 419 F.3d 1208, 1214 (11th Cir 2005).  To plead a claim for conversion a plaintiff must allege facts that show the plaintiff had possession of the property or had the right to possess the property at the time of the conversion; a future right to possession is insufficient.  See id. at 1214-15.  The allegations in the complaint negate Plaintiff's conclusion that Plaintiff had possession of, or any right to possess, the loan proceeds at the time the FC Parties allegedly converted them.

The proceeds of Plaintiff's loans to WVP are money, and money cannot be the subject of conversion unless it can be readily identified with a special mark or unless it is put in a trust.  Indus. Park Dev. Corp. v. Am. Express Bank, FSB, 960 F. Supp. 2d 1363, 1367 (M.D. Fla. 2013).  Plaintiff does not, and cannot, allege that the loan proceeds were specially marked or put in a trust.  Plaintiff alleges it made three loans, and disbursed the proceeds according to the

instructions of its borrower WVP for deposit into FCC's account.  Plaintiff does not allege the

FCC account was a trust account established for Plaintiff's benefit, or that it was the "restricted"

account referenced in the complaint.  Plaintiff does not allege (and cannot allege) that it had a

right to possess funds in FCC's account.   Instead, Plaintiff repeatedly concedes FCC, not

Plaintiff, was "the holder of the account" into which the loan proceeds were deposited.  See

Compl. ¶¶ 63, 75, 76, 78, 80, 87, 88, 94, 95, 97, 99.  As the account holder, FCC was the only

one entitled to possession of funds in it.   Because Plaintiff was a stranger to that account,

Plaintiff had no right to funds on deposit in that account.  See Fla. Stat. § 655.83 (providing

conditions precedent to recognition of adverse claim to deposit account).   Accordingly,

Plaintiff's conclusion that "[t]he $28,542,000 deposited to the FCC Account is the property of

Plaintiff" (Compl. ¶ 134) is incorrect as a matter of law.

Plaintiff cannot allege that the loan proceeds were specially earmarked funds to be held

for Plaintiff and then returned to Plaintiff intact together with a separate payment of interest.

Plaintiff alleges that its transaction with the FC Parties was a loan; but that transaction could not

have been a loan at all if Plaintiff continued to control the loan proceeds.  The allegations of the

complaint require the conclusion that, upon funding each of its loans, Plaintiff exchanged its

right to possess the loan proceeds for the contractual right to be repaid as specified in the loan

agreements.  The failure to repay a loan as agreed does not constitute conversion, even when the

borrower is alleged to have accepted loan proceeds with "no intention of repaying the loan."

Walker v. Figarola, 59 So. 3d 188 (Fla. 3d DCA) (affirming entry of judgment on the pleadings

for defendant on conversion claim), review denied, 76 So. 3d 939 (Fla. 2011).   Moreover,

Plaintiff's complaint alleges that the loan proceeds were intended by Plaintiff to have been

pledged to Wells Fargo.   Plaintiff cannot plausibly claim a right to possession of the loan proceeds Plaintiff delivered to FCC to pledge to Wells Fargo as collateral.

Because Plaintiff's predicate claim for conversion fails as a matter of law, Plaintiff's claim against Wells Fargo for "aiding and abetting conversion" fails too, and Count I should be dismissed.

**2.   The Complaint Fails to State a Claim for Fraudulent Misrepresentation.**

Under Florida law, the elements of a claim for "actionable fraud are (1) a false statement concerning a material fact; (2) knowledge by the person making the statement that the representation is false; (3) the intent by the person making the statement that the representation will induce another to act on it; and (4) reliance on the representation to the injury of the other party. . . .   [T]here must be an intentional material misrepresentation upon which the other party relies to his detriment." Lance v. Wade, 457 So. 2d 1008, 1011 (Fla. 1984)).   The complaint fails to allege any actionable representations by Wells Fargo to Plaintiff, and fails to show that Plaintiff relied on any representations by Wells Fargo.

Plaintiff contends that Wells Fargo, through Rafael and one of two "unidentified" Wells Fargo agents (see Compl. ¶¶ 43 and 51), made "material false statements and representations, including, without limitation, those statements and representations set forth in paragraphs 37-43, 46, 51-56, 59-61, 66-72, 79, and 85." (Id. at ¶ 189).   But the oral statements described in those paragraphs are alleged to have been made to B&V, not Plaintiff.   The complaint does not allege facts to support the legal conclusion that B&V were Plaintiff's agents, and actually alleges facts that indicate that B&V were not Plaintiff's agents in October 2014, when certain of the alleged misrepresentations were made to B&V, three months before Plaintiff was first approached by the FC Parties.   The party relying on the existence of an agency relationship bears the burden of

establishing it.  Kaloe Shipping Co. v. Goltens Serv. Co., 778 F. Supp. 2d 1346, 1351 (S.D. Fla.

2011).  Plaintiff's claims depend on the legal conclusion that B&V were Plaintiff's agents, but

the complaint does not identify them as Plaintiff's principals, officers or employees.  Plaintiff

must plead facts to show its purported agency relationship between B&V, and without such

allegations of fact, Plaintiff's fraudulent misrepresentation claim fails.  See, e.g., Gayou v.

Celebrity Cruises, Inc., 2012 U.S. Dist. LEXIS 77536, *27-*31 (S.D. Fla., June 5, 2012)

(Ungaro, J.) (dismissing tort claims founded on agency relationship between cruise line and

shore excursion operator, where complaint stated only bare elements of agency relationship,

without supporting allegations of fact).

Additionally, all but one of the written statements on which Plaintiff bases its fraudulent

misrepresentation claim were in letters sent to Plaintiff by the FC Parties' principal, Mr. Van

Eman, not by any Wells Fargo employee.  See Compl. ¶¶ 59-60, 66 and 85.  The only written

statement purportedly directly attributable to a Wells Fargo employee is the statement in Rafael's

June 2, 2015 e-mail that "[t]he contribution has been received and matched by Forrest Capital

and everything is set.  We are processing all requirements and moving forward.  The signature

cards are on their way."  See id. at ¶ 70.  However, the complaint alleges that Rafael's email was

directed to Mr. Burlingham, not to Plaintiff.  See id. at ¶¶ 69-70.  Mr. Burlingham's instruction

to Rafael to "reply all" when responding to his request for confirmation supports the inference

that Mr. Burlingham may have intended Plaintiff to rely on Rafael's response by virtue of being

copied on it.  But it does not support the inference that Rafael, much less Wells Fargo, intended

Plaintiff to do so.

The fraudulent misrepresentation claim also fails because it relies on vague and general

statements, and purported promises to take future action that are not actionable as a matter of

law.   A claim for fraudulent misrepresentation may be based only on a false statement concerning a specific material fact, not on general statements or promises to do or not do something at some unspecified future time.   Thompkins v. Lil' Joe Records, 476 F.3d 1294, 1315-16 (11th Cir. 2007).  Plaintiff contends it relied on the following purported representations made to B&V:

- that FCP and Mr. McConley were "clients in good standing" of Wells Fargo and  Advisors (id. at ¶ 46 );

- that FCP's "family office" had assets of "hundreds of millions" of dollars (id. at ¶ 39  );

- that Wells Fargo and Advisors "had been involved in similar financing deals with the [FC Parties] and other lenders "that were successfully completed" (id. at ¶ 41);

- that FCP "had $100 million in assets with [Advisors] that was dedicated to investing in Weathervane's film financing projects" (id. at ¶ 41);

- that "should [Plaintiff] agree to lend the funds to WVP, [the Bank] would hold [the] proceeds in a restricted account" (id. at ¶¶ 46, 51); and

- that Wells Fargo "would be willing to provide up to $100 million of collateralized loan exposure for FCP (id. at ¶ 51).

Such statements, at best, constitute alleged promises to undertake to do something in the future, or general statements that are too vague or immaterial to support a claim for fraudulent misrepresentation.   See, e.g., Plantation Key Dev., Inc. v. Colonial Mortgage Co. of Ind., Inc., 589 F.2d 164, 172 (5th Cir.1979) (a promise of future action cannot be a basis for fraud); Century 21 Admiral's Port, Inc. v. Walker, 471 So. 2d 544 (Fla. 3d DCA 1985) (affirming dismissal of fraudulent misrepresentation claim where alleged statement was too indefinite to justify reliance).  Accordingly Count V should be dismissed.

## IV.   CONCLUSION

For the foregoing reasons, Wells Fargo respectfully requests entry of an order dismissing Plaintiff's claims against Wells Fargo, together with such other and further relief—including an award of Wells Fargo's costs, expenses and attorneys' fees incurred in defense of Plaintiff's claims—as may be available under the circumstances.

/s/      Beth A. Cronin
CHARLES M. HARRIS, JR., FBN 967459 (Lead Trial Counsel)
charris@trenam.com / gkesinger@trenam.com
BETH A. CRONIN, FBN 0054933
bcronin@trenam.com / slord@trenam.com
JUSTIN L. DEES, FBN 048033
jdees@trenam.com / jstraw@trenam.com
Trenam, Kemker, Scharf, Barkin,
   Frye, O'Neill, & Mullis, P.A.
200 Central Avenue, Suite 1600
St. Petersburg, FL 33701
Phone 727.896.7171/Fax 727.822.8048
Attorneys for defendant Wells Fargo Bank, N.A.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was filed via the Court's CM/ECF system, which will forward a copy of the foregoing, together with the notice of electronic filing of same, via email to all counsel of record on the service list attached, and that a copy of the foregoing and electronic notice of filing same also was served by U.S. Mail on unrepresented party Benjamin Rafael, 11111 Biscayne Boulevard, Unit 19H, Miami, FL 33181, all on this 23d day of June 2016.

/s/  Beth A. Cronin
Attorney

<u>**SERVICE LIST**</u>
**Adana Investing, Inc. v. Wells Fargo Bank, N.A., et. al.**
**Case No. 16-CIV-21562-UNGARO/GOODMAN**
**United States District Court, Southern District of Florida**

John D. Couriel, Esq.
Stephanie D. Hauser, Esq.
Kobre & Kim LLP
2 South Biscayne Boulevard, 35th Floor
Miami, FL 33131
john.couriel@kobreim.com
stephanie.hauser@kobrekim.com
*Counsel for Plaintiff*

Beth A. Black, Esq.
Joseph A. Vallo, Esq.
Lauren Whetstone, Esq.
GREENBERG TRAURIG , P.A.
777 South Flagler Drive, Third Floor East
West Palm Beach, Florida  33401
BlackB@gtlaw.com
ValloJ@gtlaw.com
WhetstoneL@gtlaw.com
*Counsel for Defendants Wells Fargo Advisors, LLC*
 *and Paul Zoch*

Barbara J. Riesberg, Esq.
Riesberg Law
Biscayne Bank Tower, Suite 1100
2601 South Bayshore Drive
Miami, FL 33133
barbara@riesberglaw.com
*Counsel for Defendant Hernan Bermudez*